UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>STEPHEN BURTON,<br>　also known as "Andrew Pittman,"<br>　"Robert Allison" and<br>　"Derek Campbell" and<br><br>JAMES WELLESLEY,<br>　also known as "Andrew Fuller" and<br>　"Andrew Templar,"<br><br><br>　　　　　　　　　　Defendants. | CRIMINAL CASE NO. 1:22-CR-00079 (PKC)(PK) |

## AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF JAMES WELLESLEY

I, Assistant United States Attorney Lauren Howard Elbert, being duly sworn, state that:

1.     I am a citizen of the United States of America and a resident of the State of New York. I make this affidavit in support of the request of the United States of America to the United Kingdom of Great Britain and Northern Ireland for the extradition of James Wellesley.

1

2.     I graduated from Columbia University School of Law.  I am licensed to practice law in the State of New York.  From 2013 to the present, I have been employed by the U.S. Department of Justice as an Assistant U.S. Attorney for the Eastern District of New York.  My duties are to prosecute persons charged with criminal violations of the laws of the United States.  During my practice as an Assistant U.S. Attorney, I have become knowledgeable about the criminal laws and procedures of the United States.

3.     In the course of my duties, I have become familiar with the charges and evidence in the above-captioned case of <u>United States v. Stephen Burton, et al.</u>, criminal case number 1:22-CR-00079 (PKC)(PK).  The charges arose out of an investigation by the Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office for the Eastern District of New York (together, the "U.S. Authorities").  The investigation revealed that between approximately June 2017 and February 2019, the defendant James Wellesley ("Wellesley"), together with his co-defendant Stephen Burton ("Burton," and together with Wellesley, the "defendants"), defrauded dozens of investors, primarily in the United States, out of at least $99 million.  The defendants, through their company "Bordeaux Cellars," purported to act as a broker of loans between investor-lenders and high-net-worth individuals that were purportedly secured by valuable collections of wine.  In reality, the loans never existed, the investors in the purported loans were defrauded, and Bordeaux Cellars was a swindle.

## SUMMARY OF THE FACTS OF THE CASE

4. The defendants formed a company called Bordeaux Cellars, which was the trade name for two private limited companies, Bordeaux Cellars, Limited and Bordeaux Cellars London, Ltd., registered, respectively in Hong Kong and London, which were controlled by the defendants. Burton was the founder and Chief Executive Officer of Bordeaux Cellars, and Wellesley was the Chief Financial Officer and Operations Manager.

5. In or about and between June 2017 and February 2019, the defendants marketed Bordeaux Cellars as a broker of "Term Loans." Term Loans are loans with a specific maturity date. The defendants represented to investors, and potential investors, that the Term Loans were secured by specific bottles of wine owned by the purported borrowers.

6. In furtherance of the scheme, the defendants and their co-conspirators made material misrepresentations and omissions relating to, among other things: (1) the existence of the Term Loans; (2) Bordeaux Cellars' role as a broker of the Term Loans between investors and borrowers; and (3) the existence, name, vintage, value and number of bottles of wine pledged as collateral for the Term Loans.

7. During the relevant period, the defendants solicited investors at, among other places, investor conferences sponsored by Sovereign Man, a company that offers investment and financial advice on a website and in publications.[1] Sovereign Man is owned and

---

[1] A video of Burton presenting at an event sponsored by Sovereign Man is publicly available on YouTube, see https://www.youtube.com/watch?v=4_jZUXDJ9as&t=156s

operated by an American citizen named James Hickman. At the conferences, some of which were held in the United States and some in other countries such as Mexico, the defendants presented to prospective investors the opportunity to invest in Term Loans brokered by Bordeaux Cellars. Specifically, the defendants represented to prospective investors the following: (1) that Bordeaux Cellars offered the opportunity to invest in Term Loans with individual borrowers or companies controlled by borrowers that would generate quarterly interest payments; (2) the Term Loans would be secured by a chattel mortgage on specific bottles of valuable wine owned by the borrower; (3) Bordeaux Cellars would maintain custody of those specific bottles of wine pledged by the borrower, and would store them in an appropriate secure storage facility; and (4) each loan would be for an amount equal to, at most, 35 to 45 percent of the value of the specific bottles of wine pledged as collateral.

8. Victim investors recall both Burton and Wellesley participating in presentations at conferences on behalf of Bordeaux Cellars and several met personally with Wellesley at these events. Hickman, the sponsor of the Sovereign Man investor conference, himself invested hundreds of thousands of dollars in loans purportedly brokered by Bordeaux Cellars. He has personal knowledge of the representations made by Wellesley and Burton to investors at the Sovereign Man conference regarding the purportedly secure nature of the loans and the valuable wine purportedly used as collateral, and the function of the loans throughout the scheme.

9. A number of other victim investors also had personal interactions with Burton and Wellesley in which they were falsely assured that the lenders and their wine

4

collections existed and given documents supporting the purported value of the wine.  For example, one victim had a phone conversation with Wellesley in which Wellesley claimed that the loan in which she would invest would be limited to 30 percent of the value of the wine securing it.

10. Investors in the Term Loans, including residents of the Eastern District of New York, received documents relating to their investment, including a Loan Broker Agreement, a Facility Letter, and a Loan Agreement and Chattel Mortgage Deed Over Wine.  These documents bore signatures of either or both of the defendants.

11. The Loan Broker Agreement summarized the key terms of the loan and identified the name, vintage and number of bottles of wine pledged as collateral for that loan (the "Secured Wine").  Each Loan Broker Agreement provided, among other things, that the Secured Wine had been transferred into Bordeaux Cellars' custody at its storage facility, but that "immediately following draw-down [of the loan] the [Secured Wine] will be transferred into [the investor's] name under [Bordeaux Cellars'] custodian account."  The Loan Broker Agreement further claimed that during the term of the loan, Bordeaux Cellars would monitor the value of the collateral to ensure that the security margin (i.e. the 35-45 percent ratio of loan value-to-collateral) would be maintained.

12. The Facility Letters identified the name, vintage and number of bottles of wine pledged as the Secured Wine, and represented that (1) "the Secured Wines have been transferred into [Bordeaux Cellars'] custody and are held at [Bordeaux Cellars' storage facility "Storage Facility-1"] where the wines will be stored in your name pending completion of the

Chattel Mortgage and the draw-down of the loan. Thereafter title to the wines will be transferred into our Custodian account and be held in the name of the Lender, subject to the rights and obligations set out in the Chattel Mortgage . . . ;" (2) "[t]he Loan is offered on condition that the total sum outstanding is [35% to 45%] of the value of the Secured Wines" (i.e., the loan-to-value ratio); and (3) if the amount outstanding compared to the value of the Secured Wine exceeded the specified loan-to-value ratio, and the borrower failed to take actions to restore the proper ratio, Bordeaux Cellars could sell the Secured Wine to repay the investor-lender, or transfer the Secured Wine to the investor-lender.

13. The Loan Agreement and Chattel Mortgage Deed Over Wine set out the terms of the loan and mortgage, identified the name, vintage and number of bottles of wine pledged as collateral for that loan (i.e., the Secured Wine), and provided, among other things, that: (1) the borrower granted a security interest, "by way of first legal mortgage" in the Secured Wine; (2) a "precondition" of the loan was that "the Secured Wine has been received at the [Storage Facility-1];" (3) Bordeaux Cellars "will hold the Secured Wine at the [Storage Facility-1] under its Custodian's account in the name of the Lender" during the term of the loan; and (4) the "Secured Wine has been placed in the name of the Lender under the Custodian's account at the [Storage Facility-1.]"

14. In total, the defendants induced investors to invest in excess of approximately $99.4 million into Term Loans purportedly brokered by Bordeaux Cellars.

15. In reality, Bordeaux Cellars did not have custody over the Secured Wine. Specifically, inventory records from the storage facility identified in the majority of Bordeaux

6

Cellars' agreements (Storage Facility-1) reflect that Bordeaux Cellars had thousands fewer bottles of wine in its custody than the loan documents claimed. In addition, many of the specific bottles identified as collateral in the loan documents were never in Bordeaux Cellars' custody.

16. Financial records from bank accounts used by Bordeaux Cellars reflect incoming deposits from victim investor lenders. These records also show that these incoming funds, i.e., proceeds of the Term Loans, were not directed to individual borrowers as promised in the loan documents. Instead, they were used to make payments to other Bordeaux Cellars investors, and/or misappropriated by the defendants and used to pay personal expenses. By using the incoming, fraudulently-obtained investor funds to make promised interest payments, the defendants were able to promote the continuation of the scheme, enticing additional investors and generating additional ill-gotten profits.

17. During the course of the scheme, both defendants corresponded with individual investors over email, including sending agreements, confirming payments, and discussing appraisals of purported wine collections. Several victim investors described Wellesley as their main point of contact.

18. On or about July 8, 2018, Wellesley sent an email to Serge Danilov, a Brooklyn, New York resident who invested in a $150,000 loan purportedly brokered by Bordeaux Cellars. Wellesley's email to Danilov included a purported appraisal of the specific bottles of wine securing Danilov's $150,000 loan. However, there is no record of these wine bottles being stored in the storage facility where Wellesley and Burton claimed the wine was located. On or about July 10, 2018, Danilov sent his $150,000 investment via wire transfer to an

7

account held in the name of Bordeaux Cellars at Banco Santander in the United Kingdom. Following receipt of those funds, no money was transferred to the party named as the borrower in the investor's loan agreements. Instead, following the receipt of these funds, small payments equivalent to fraudulent "interest" payments were sent to other investor victims and misappropriated by Burton and Wellesley. These facts form the basis of Count Two of the Indictment, as described below.

19. From June 2017 until approximately December 2018, investors in the Bordeaux Cellars' Term Loans received interest payments as promised, and at the end of the term of their loan had the choice to either receive back their principal or roll it into another loan. Several investors invested in multiple loans purportedly brokered by Bordeaux Cellars. In approximately February 2019 all interest payments made on the Term Loans stopped, and the investors in the Term Loans with loans outstanding received no principal after that point. Notably, the interest payments all stopped in or around February 2019, even though the Term Loans were purportedly issued to an array of different borrowers and secured by different collections of valuable wine.

20. After the loan payments stopped, several victim investors attempted to contact Burton and Wellesley to learn what happened to their investment. The defendants stopped answering email and phone calls. On or about January 28, 2019, one victim attempted to call the London office for Bordeaux Cellars listed on a business card, and was told by the person answering the phone that there was no Bordeaux Cellars at that office. Likewise in March 2019, one victim investor sent an email to Wellesley asking about his delayed interest

8

payments and Wellesley responded that he was waiting for an authorization.  The payment never came, and Wellesley never responded to further messages.

## PROCEDURAL HISTORY OF THE CASE

**The Charging Process**

21.     Under the federal law of the United States, a criminal prosecution is commenced when a grand jury files an Indictment.  Institutionally, a grand jury, though an arm of the court, is an independent body composed of private citizens—not less than 16 and not more than 23 people—whom the U.S. District Court selects at random from the residents of the judicial district in which the court resides.  The purpose of the grand jury is to review the evidence of crimes presented to it by U.S. law enforcement authorities.  After independently reviewing this evidence, each member of the grand jury must determine whether there is sufficient evidence to believe that a crime has been committed and that a particular person committed that crime.  If at least 12 grand jurors find that the evidence they have reviewed is sufficient to believe that a particular person committed the crime, the grand jury may return an Indictment.  An Indictment is a formal written accusation that charges the particular person, now a defendant, with a crime, and identifies the specific laws that the defendant is accused of violating.

22.     After a grand jury returns the Indictment, a warrant for the defendant's arrest may be issued at the direction of a United States District Judge or Magistrate Judge.  Under United States law, the arrest warrant is simply a document authorizing a law enforcement officer to take physical custody of a defendant and bring him to court to answer the charges contained in the

Indictment. The type of detail on the face of an arrest warrant regarding the charges against a defendant can vary by district. The fact that an arrest warrant summarizes the outstanding charges in words, provides only some of the relevant statutory citations, or merely references the Indictment does not alter the validity of the arrest warrant to authorize a defendant's arrest on all of the charges contained in the corresponding Indictment. Under United States law, it is the Indictment, and not an arrest warrant, that controls the specific number and type of offenses with which the defendant is charged.

## The Charges and Pertinent U.S. Law

23.     On February 28, 2022 a grand jury sitting in Brooklyn, New York returned an Indictment, charging James Wellesley and Stephen Burton with the following federal criminal offenses in violation of the laws of the United States:

| | |
|---|---|
| Count One: | Wire fraud conspiracy in violation of Title 18, U.S. Code, Section 1349, which carries a maximum penalty of 20 years in prison. |
| Count Two: | Wire fraud in violation of Title 18, U.S. Code, Sections 1343 and 2, which carries a maximum penalty of 20 years in prison. |
| Count Four:[2] | Money laundering conspiracy in violation of Title 18, U.S. Code, Section 1956 which carries a maximum penalty of 20 years in prison. |

---

[2]     Count Three of the Indictment relates solely to Burton.

24. This Indictment was filed with the U.S. District Court for the Eastern District of New York. It is the practice of the U.S. District Court for the Eastern District of New York to retain the original Indictment and file it with the records of the court. Therefore, I have obtained a copy of the Indictment from the clerk of the court and have attached it to this affidavit as **Exhibit 1**.

25. On February 28, 2022, based on the filing of the Indictment, the United States District Court for the Eastern District of New York issued a warrant for James Wellesley's arrest. The arrest warrant remains valid and executable to apprehend Wellesley on the charges set forth in the Indictment. It is the practice of the U.S. District Court for the Eastern District of New York to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained from the clerk of the court copies of the arrest warrant for Wellesley and have attached it to this affidavit as **Exhibit 2**.

26. Each count of the Indictment charges a separate offense. Each offense is punishable under a statute that: was the duly enacted law of the United States at the time the offense was committed; was the duly enacted law of the United States at the time the Indictment was filed; and is currently in effect.

27. Each offense is a felony offense punishable under U.S. law by more than one year of imprisonment. I have attached copies of the pertinent sections of these statutes and the

applicable penalty provisions to this affidavit as **Exhibit 3**.[3]

### Elements for Count One

28.     Count One charges Wellesley with wire fraud conspiracy in violation of Title 18, United States Code, Section 1349.  Under United States law, a conspiracy is an agreement to commit one or more criminal offenses.  The agreement on which the conspiracy is based need not be expressed in writing or in words, but may be simply a tacit understanding by two or more persons to do something illegal.  Conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member.  A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the identities of all the other members of the conspiracy.  If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, he is guilty of conspiracy even though he did not participate before and may play only a minor part.  A conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership.

29.     The crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crimes."  Consequently, a conspirator can be found

---

[3]     Title 18, U.S. Code, Section 3551 et seq. is referenced in the Indictment. This particular code section pertains to factors and guidelines in relation to the imposition of a sentence, as well as terms of probation and the amount of a fine to be imposed in addition to the required sentence. These are not elements of the offenses charged.

12

guilty of the crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

30. As stated, the alleged object of the conspiracy was wire fraud. To satisfy its burden of proof and convict Wellesley for wire fraud conspiracy, the United States must establish that:

    a. Two or more people formed an unlawful agreement to commit the crime of wire fraud, in violation of Title 18, United States Code, Section 1343; and

    b. The defendant knowingly and intentionally joined the conspiracy.

31. The elements of the offense of wire fraud are:

    a. That there was a scheme or artifice to defraud victims by obtaining money or property from them by materially false and fraudulent pretenses, representations or promises;

    b. That the defendant knowingly and willfully participated in the scheme or artifice to defraud the victims with knowledge of its fraudulent nature and with specific intent to defraud the victims; and

      c.    That in execution of that scheme, the defendant used or caused the use of interstate or international wires.

### Summary of the Evidence for Count One

32.    The United States will meet the elements for Count One by showing that: (1) Wellesley agreed with Burton to commit the crime of wire fraud; and that in furtherance of that agreement, (2) Wellesley and Burton misrepresented and caused to be misrepresented certain material information relating to the Term Loans brokered by Bordeaux Cellars, including the existence of the borrowers, existence and value of the wine purportedly used as collateral for the Term Loans, and Bordeaux Cellars' role as a broker; (3) that Wellesley and Burton made these misrepresentations intentionally and in order to defraud investors in the Term Loans and obtain money from the investors through deceit; and (4) that in furtherance of the scheme Wellesley and Burton sent email correspondence via international wire.

33.    The evidence will include: witness testimony and documents setting forth the misrepresentations made by Burton and Wellesley about the Term Loans, financial records showing the incoming loan proceeds were used to make Ponzi payments to other lenders and misappropriated by Burton and Wellesley, records from the wine storage facility showing that Bordeaux Cellars maintained nowhere close to the volume or quality of wines that they purported to maintain custody over, and email (<u>i.e.</u> wire) communications between Burton, Wellesley and victims, including emails attaching fraudulent wine appraisals and agreements with false representations and misleading terms.

**Elements for Count Two**

34.     Count Two charges Wellesley with wire fraud in violation of Title 18, United States Code, Section 1343. The elements of wire fraud have been described in relation to Count One.

35.     As an alternative theory of liability, Count Two charges Wellesley with aiding and abetting Burton's commission of wire fraud.  Aiding and abetting, under Title 18, U.S. Code, Section 2, provides that whoever commands, procures, assists in, or causes the commission of a crime shall be held accountable and punished in the same manner as the principal, or the person who actually carried out the task.  Additionally, whoever willfully causes an act to be done that would be a federal crime if directly performed by him is punishable as a principal.

36.     Based on this theory, Wellesley may be found guilty of Count Two, even if he did not personally perform every act involved in the commission of the crimes charged, as long as he intentionally helped, encouraged, or willfully caused Burton to commit the crime.

**Evidence in Support of Count Two**

37.     The United States will establish the elements of wire fraud in relation to the investment of Serge Danilov, as described above.  The evidence that Wellesley and Burton defrauded Danilov will include the July 8, 2018 email (wire) communication from Wellesley to Danilov, purportedly appraising the specific bottles of wine securing Danilov's $150,000 loan. The evidence will also include records from the storage facility that Wellesley and Burton claimed stored this wine reflecting the fact that Bordeaux Cellars never had custody of such

15

wine.  In addition, the evidence will include bank records showing that Danilov's investment was never used to extend a loan to any high-net-worth individual, but was instead used to make interest payments to other victim-investors and misappropriated by Burton and Wellesley.

### **Elements for Count Four**

38.     Count Four charges Wellesley with money laundering conspiracy in violation of Title 18, U.S. Code, Section 1956(h).  The specific type of money laundering objective of the conspiracy, as charged in the Indictment, is proscribed by Title 18, U.S. Code, Section 1956(a)(1)(A)(i).

39.     The elements of the money laundering conspiracy, as charged in the indictment, are that:

      a. Two or more people formed an unlawful agreement to commit the crime of money laundering, in violation of Title 18, U.S. Code, Section 1956(a)(1)(A)(i); and

      b. The defendant knowingly and intentionally joined the conspiracy.

40.     The elements of money laundering, as proscribed by Title 18, U.S. Code, Section 1956(a)(1)(A)(i) are:

    a.    The defendant conducted a financial transaction involving property constituting the proceeds of specified unlawful activity, namely, wire fraud;[4]

    b.    The defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity; and

    c.    The defendant acted with the intent to promote the carrying on of the specified unlawful activity.

## EVIDENCE IN SUPPORT OF COUNT FOUR

41.    The government will prove the elements of Count Four by establishing, through the witness testimony and records described above, that:

    a.    The loan proceeds obtained by Bordeaux Cellars were the proceeds of a wire fraud scheme;

    b.    Burton and Wellesley arranged for a portion of those proceeds to then be transmitted to other investors in Bordeaux Cellars' Term Loans in order to create the appearance of "interest payments" made by borrowers; and

    c.    These payments promoted the fraud scheme by keeping it operating for longer periods of time.

---

[4]    Wire fraud constitutes "specified unlawful activity" as defined in the relevant statutes. *See* Title 18, U.S. Code, Section 1956(c)(7)(A) and Title 18, United States Code, Section 1961(1)

## WELLESLEY'S LOCATION

42. According to information received from UK authorities, on or about February 4, 2022, Wellesley was arrested in the UK on an Interpol notice issued at the request of the United States, and he remains in UK custody.

## IDENTIFICATION INFORMATION FOR JAMES WELLESLEY

43. Wellesley is a citizen of the United Kingdom born on August 25, 1966.

44. James Hickman, who sponsored the Sovereign Man conferences where Wellesley and Burton promoted Bordeaux Cellars, and who himself was a defrauded investor, has identified the photograph attached as **Exhibit 4** to law enforcement as James Wellesley.

## SURRENDER OF PROPERTY

45. Pursuant to Article 16 of the Annex to the U.S.—UK Extradition Instrument, it is requested that any items relevant to the charged offenses and found in James Wellseley's possession at the time of his arrest be delivered to the United States if he is found to be extraditable.

## CONCLUSION

46. The following attachments support this request for the extradition of James Wellesley.

    a. Exhibit 1 is a copy of the Indictment.

    b. Exhibit 2 is a copy of the arrest warrant against James Wellesley.

  c.  Exhibit 3 is a copy of the pertinent sections of the following statutes and their penalties:

    (1)  Title 18, U.S. Code, Section 1349;

    (2)  Title 18, U.S. Code, Section 1343;

    (3)  Title 18, U.S. Code, Section 1956;

    (4)  Title 18, U.S. Code, Section 1961;

    (5)  Title 18, U.S. Code, Section 2; and

    (6)  Title 18, U.S. Code, Section 3551

  d.  Exhibit 4 is a copy of a photograph of James Wellesley.

47.  I have thoroughly reviewed the government's evidence against James Wellesley and attest that this evidence indicates that James Wellesley is guilty of the offenses charged in the Indictment.

Executed this 14th day of March 2022, at Brooklyn, New York, United States of America.

              BY: *Lauren Howard Elbert*
                 Lauren Howard Elbert
                 Assistant U.S. Attorney

Sworn to telephonically before me this 14th day of March, 2022, at Brooklyn, New York, United States of America.

March 14, 2022 at 1:28 p.m.                     *Roanne L. Mann*
                                                                HONORABLE ROANNE L. MANN
                                                                United States Magistrate Judge