# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and*
*Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

The Honorable Pamela K Chen                                         April 13, 2026
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*United States v. James Wellesley*, 22 CR 79 (PKC)

Your Honor:

I represent Mr. Wellesley, who was convicted by guilty plea of Conspiracy to Commit Wire Fraud. The PSR estimates his Guidelines at 121-151 months. For the reasons set forth below, the defense respectfully submits a sentence of 66 months is sufficient, but no greater than necessary, to achieve the purposes of sentencing. 18 U.S.C. § 3553.

### Preliminary Statement

This case warrants real punishment but not the 10-plus year sentence called for by the Guidelines. Indeed, a significant variance is appropriate if only to make Mr. Wellesley's actual punishment comparable to what it would be were he a U.S. citizen. As detailed below, he has spent several years under harsh conditions in pretrial detention at the MDC and a similarly notorious British detention facility. Going forward he will be ineligible for the various programs through which prisoners mitigate the severity of their sentences including Earned Time Credits under the First Step Act, the RDAP program, or serving a portion of his sentence at a halfway house. These are all significant reductions in actual punishments that Mr. Wellesley would likely receive as a U.S. citizen. When these factors, along with his age, efforts at rehabilitation, the harshness of his pretrial detention, role in the offense and sentences in comparable cases are considered, it is plain a significant variance is appropriate.

### Personal History

Mr. Wellesley's personal history is remarkable primarily for his commitment to his wife and marriage. His mother was a teacher and his father the director of a trade organization of butchers in England. He has been with Fiona Fuller since they were both teenagers. His wife suffers from a wide range of health problems detailed in the PSR including kidney disease (resulting in a prior transplant), diabetes, advanced osteoporosis colitis, and diverticulitis (bowel inflammation). (PSR ¶ 50.) Ms. Fuller has provided a variety of records concerning her conditions that are available for review upon request of the government, probation department or Court. She is entirely dependent on others for caretaking, both physically and emotionally, a weight now being borne by the couple's daughter. (*Id.*)

1

Indeed, Mr. Wellesley sought to have his case prosecuted in England largely so that he could be nearer to her while in custody.[1] They are very much in love.

She wrote counsel the following email for inclusion in this sentencing submission:

> I respectfully ask the Court to be aware of my medical condition and my dependence on my husband's support. I suffer from multiple serious and chronic illnesses, including polycystic kidney disease with significant loss of renal function, type-2 diabetes, a cardiac condition, and recurrent diverticular disease that has previously resulted in bowel perforation, sepsis, and hospitalisation. These conditions are exacerbated by stress and have worsened during my husband's prolonged incarceration.

> Over the past year alone, I have lost approximately thirty percent of my remaining kidney function. My treating physicians have confirmed that the ongoing strain of separation and uncertainty has materially affected my health. I rely on my husband for daily physical and emotional support, medication management, and stability during medical crises. While our adult children have tried to assist, they are not able to replace the role he plays in my care.

> I do not raise this to minimise my husband's offence or to ask for sympathy, but to explain the real and continuing impact his absence has had on my health and wellbeing. I respectfully ask the Court to take these circumstances into account when determining his sentence.

Email to Defense Counsel from Fiona Fuller.

### **Offense Conduct**

The offense conduct is fully detailed in the PSR but some important points bear highlighting. To be clear, Mr. Wellesley does **not** dispute being a knowing participant in the scheme or seek a role adjustment. But there are mitigating factors in terms of his culpability.

Mr. Wellesley joined Bordeaux Cellars in 2017 after it had been operational for several years under a different name. Though Mr. Wellesley had a fancy sounding title as "CFO" for the purposes of impressing potential investors, he essentially was a salesperson working on commission. Mr. Burton formed ABM Limited (which eventually became Bordeaux Cellars) in 2011. Mr. Wellesley joined the firm long after it had been established and been featured in the financial press, including on CBNC. See CNBC "Need Money? Score Big Cash for Fine Wine," March 1, 2013, www.cnbc.com/2013/03/01/need-money-score-big-cash-for-fine-wine.html.

---

[1] English law allows a defendant to challenge extradition on the ground that England has an equal or greater interest in prosecuting the conduct and the witnesses and evidence are based there. As the defense understands it, many of the victims and most of the offense conduct took place in England.

Mr. Wellesley did not have signing authority over the firm's bank accounts. Indeed, the only accounts to which he had access in the long list of accounts identified for forfeiture in the PSR were his three personal accounts at Metro Bank. He has agreed to a $1 million forfeiture judgment, which he believes overestimates his profit from the scheme. He had no involvement in the movement of money all over the world.

Mr. Wellesley also did not have general access to the cellars where the wine was held. There was evidence that shortly before his arrest Mr. Burton moved all of the wine – which was already far less than represented but might have been used to mitigate losses – from the storage facility where it had been held to a separate storage facility he controlled, which was then found empty. (Complaint ¶¶ 17, 22.) Mr. Burton was arrested shortly thereafter in possession of nine kilograms of gold ingots and coins, expensive watches, false identification documents and a large amount of cash. (*See* Complaint ¶¶ 22.).

## **The Guidelines**

The Guidelines recommend an extremely high sentence in this non-violent case. The defendant's recommended sentence is elevated in part due to the cumulative effect of somewhat overlapping enhancements. The defendant's offense level is boosted 24 points because the offense involved losses of more than $65 million, and he receives an additional two points because the fraud was committed outside the United States, or was otherwise sophisticated. It would be a rare $65 million fraud case that did not qualify for this enhancement, which serves to raise Mr. Wellesley's recommended sentence by two years. The Second Circuit previously held that the disproportionate impact of cumulative enhancements at the higher end of the offense table was a ground for a departure when the Guidelines were mandatory. *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003), adhered to on reh'g sub nom. *United States v. Lauersen*, 362 F.3d 160 (2d Cir. 2004), cert. granted, judgment vacated on other gounds, 543 U.S. 1097 (2005). The Court noted that "most fraud schemes that obtain more than one half million dollars involve careful planning." *Id.* As this point is even more true of a $65 million fraud, two extra years for the sophistication of the scheme simply makes no sense unless a similarly sized fraud can be completed without sophistication.

This same enhancement would apply on the alternative ground that a substantial part of the scheme occurred outside the United States. But it is hard to see how this makes the conduct particularly aggravated. Mr. Wellesley did not relocate to commit the crime. He operated from England because he is English. Americans were not uniquely targeted.

Separately, many believe the Guidelines for fraud are simply too high. Section 2B1.1 is not the result of the Sentencing Commission's institutional expertise. Judge Underhill, in a concurring opinion, criticized the Sentencing Commission for developing the loss guideline without "using an empirical approach based on data about past sentencing practices," comparing the loss guideline to the notoriously unjust child pornography guideline. *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). Judge Rakoff also cast doubt on the Guidelines' legitimacy, writing that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology." *United States v. Gupta*, at 351. He warned that the arbitrariness of the guidelines "maximize[es] the risk of injustice." *Id.*

The United States Sentencing Commission Judiciary Sentencing Information tool (JSIN) reveals that, excluding 5K1.1 cases, of the 58 fraud defendants sentenced to prison under Guideline 2B1.1 at a final offense level of 32 in CHC I, like Mr. Wellesley, the average length of imprisonment was 89 months and the median length of imprisonment was 84 months. *See* https://www.ussc.gov/guidelines/judiciary-sentencing-information. A printout from this tool is below:



**Average and Median Length of Imprisonment for Defendants in Selected Cell Who Received a Sentence of Imprisonment (excluding §5K1.1)**
Fiscal Year 2020-2024



**Note:** The figure includes the 58 defendants reported to the Commission (1) whose primary guideline was §2B1.1, with a Final  Offense Level of 32 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance  departure; and (2) the defendant received a sentence of imprisonment in whole or in part. Cases missing information necessary to  complete the analysis were excluded from this figure.

*Average and Median Length of Imprisonment* reports the average and median term of imprisonment imposed in months for cases in  which a term of imprisonment was imposed. Probation sentences are excluded. Any portion of a sentence that is an alternative  confinement as described in USSG §5C1.1 is also excluded. Cases in which a sentence is imposed, but where the length is  indeterminable, are excluded. When sentences are expressed as "time served" on the J&C, Commission staff uses the dates in federal custody to determine the length of time served when an defendant has been in custody the entire time. If the defendant has  been in and out of custody, or the start date is unclear/missing, then the Commission assigns a value of one day as a minimal time served amount for these cases. In cases where the court imposes a sentence of life imprisonment, sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal defendants given the average age of federal  defendants. Sentences of greater than 470 months are also reported as 470 months.

## Mr. Wellesley's Time in Custody

Mr. Wellesley has spent his entire time in custody – more than four years– in jails known for their poor conditions. The Court is of course familiar with the conditions at the MDC, which though better of late, are a far cry from the conditions where most non-violent fraud defendants serve their sentences. He has no major medical issues so has fared relatively well aside from being extorted on occasion by fellow inmates, which he accepts as part of life in jail. Before the MDC, Mr. Wellesley spent more than three years in custody at the HMP Wandsworth prison in London. HMP Wandsworth might well have worse conditions than the MDC – indeed Mr. Wellesley has been surprised at the conditions at the MDC given what he was told before coming and what he

experienced abroad.  Wandsworth was built in 1851.  Its population was at 50 percent above capacity – 1500 inmates in a prison built for 1000 – and it had a shocking 10 deaths in custody in the period from August 2023 through August 2024 according to an independent monitoring board.  *See* BBC, Squalid Wandsworth Prison has 'Worst Year in Memory,'" August 22, 2024, www.bbc.com/news/articles/cr40ed3443eo.  Staffing was at 50 percent of appropriate levels.  *Id.  See also*, The Justice Gap, "Troubled HMP Wandsworth Joins 'Growing Pile' of Failing Prisons as Urgent Notification Issued," May 13, 2024 (describing serious overcrowding, violence, vermin infestations, drugs and violence), available at https://www.thejusticegap.com/troubled-hmp-wandsworth-joins-growing-pile-of-failing-prisons-as-urgent-notification-issued/

Many judges of this Court have taken into account the extra punishment represented by harsh pretrial detention conditions at the MDC.  But this body of case law evolved in part from earlier cases considering the conditions of prisoners awaiting extradition.  As Judge Engelymayer explained:

> Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring the just sentence. *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure, and do so in the light of this holding"); *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (summary order) (noting that "[i]n imposing the sentence it did, the district court considered ... [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Columbia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484 (LMM), 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that the defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States ... warrant a downward departure"); *United States v. Torres*, No. 01 Cr. 1078 (LMM), 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").

*United States v. Mcrae*, No. 17 CR. 643 (PAE), 2021 WL 142277, at *4 (S.D.N.Y. Jan. 15, 2021).

The defense thus submits the severity of Mr. Wellesley's prior incarceration "merit[s] recognition … in measuring [a] just sentence."  *Id.*

## Mr. Wellesley's Future Confinement

Mr. Wellesley's future confinement will be longer, and more severe, than that of a similarly situated U.S. citizen defendant who receives the same sentence for several reasons.  First, inmates subject to immigration detainers have long been ineligible to reduce their sentence through the RDAP program, something for which Mr. Wellesley, who drinks heavily, would likely qualify.  PSR ¶ 60; 28 C.F.R. § 550.55(b).

Moreover, under the First Step Act, prisoners who undertake rehabilitative programming subsequent to their sentencing can earn credits against their sentence that reduce their actual time in custody. 18 U.S.C. § 3632(d)(4)(C). But the FSA makes prisoners subject to removal orders ineligible for such reductions in their custody, 18 U.S.C. 3632(d)(4)(E). At the government's request, Mr. Wellesley will consent to a Judicial Order of Removal at the time of sentence. He will not receive Earned Time Credits.

A federal prisoner has long been able to serve up to 10 percent of his or her sentence at an RRC, 18 U.S.C. § 3624(c) (indicating that the director of BOP "shall, to the extent practicable, *ensure* that a prisoner serving a term of imprisonment spends" the final months, but no more than a year, under conditions that will help them reenter the community) (emphasis added). Again, this benefit is unavailable to inmates with detainers. *Gallegos-Hernandez v. United States*, 688 F.3d 190, 193 (5th Cir. 2012); *United States v. Londono-Cardona*, No. CR-92-0911-02 (CPS), 1996 WL 19225, at *1 (E.D.N.Y. Jan. 2, 1996).

And with a detainer he is ineligible to serve any of his sentence at a federal prison camp. The BOP's Inmate Security Designation and Classification System indicates that being a "deportable alien" is a designated "public safety factor" that overrides others and precludes incarceration at any minimum security facility. *See generally Dieguez v. United States*, No. CIV-15-857-M, 2015 WL 5770011, at *2 (W.D. Okla. Aug. 27, 2015), report and recommendation adopted, No. CIV-15-857-M, 2015 WL 5770004 (W.D. Okla. Sept. 30, 2015)

Mr. Wellesley's incarceration is more severe for another reason as well. A husband and father, Mr. Wellesley is far removed from his family and will receive no visits during his remaining time in custody, a consequence of incarceration courts often try to mitigate through specific geographic placements. Mr. Wellesley's loved ones are on a different continent and he will not have a single visitor for the duration of his time in custody.

### **Mr. Wellesley's Age and Efforts At Rehabilitation Make him a Low Threat to Reoffend.**

Mr. Wellesley is 59 years old. The National Institute of Corrections has determined that 50 is the appropriate mark for when an incarcerated person is considered "elderly" or "aging" due to lack of access to appropriate health care prior to incarceration and the severe toll that incarceration has on people's physical health. The First Step Act included a pilot program for non-violent inmates 60 and older to be discharged after completing two-thirds of their sentence. (The program expired in 2023.) Older prisoners have the lowest rates of recidivism.[2]

He is already on the right path. The offense conduct here all occurred more than seven years ago and Mr. Wellesley is determined to make sure this is his last offense. Most significantly, he participated in a program at HMP Wandsworth that taught prisoners basic finance and business skills through a Business Builder course. (*See* Letters attached as Exhibit A.) He was such an effective teacher and mentor that the program director has offered him a position upon his release and

---

[2] *See Why Are We Spending So Much To Lock Up Elderly Prisoners Who Pose Little Threat?* (June 13, 2012) at https://www.aclu.org/blog/smart-justice/parole-and-release/why-are-we-spending-so-much-lock-elderly.

anticipates he will not only teach but participate in course design and other managerial activities.  (*Id.*) He also took part in a website coding course – no easy feat for someone his age – and quickly thereafter became a mentor to other prisoners in helping them learn coding.   (*Id.*)  He also helped other inmates with basic literacy.  He has continued these rehabilitative efforts at the MDC by working as a tutor, helping other inmates with literacy and GED prep in math, as well as other skills.  (Ex. B.) His counselor notes that he "used his time wisely and was able to impact the inmate population in a positive manner."  (*Id.*)  Like many people who have undergone struggles, Mr. Wellesley has found helping others rewarding and to be the best way of helping himself.  He is on a clear path to a law-abiding life.

## **CONCLUSION**

A Guidelines term is "greater than necessary" in this case.   18 U.S.C. § 3553.  The severity of the defendant's time in custody, and the fact that he will not receive the same reductions available to U.S.-citizen defendants, lowers the need for such a lengthy term for purposes of "just punishment." A Guidelines term is similarly not necessary to avoid "unwarranted disparities."  The defendant's actual time in custody and conditions of custody alone would make any disparity between his term and a Guidelines term warranted.  Moreover, as noted above, below-Guidelines sentences are common in fraud cases with such high recommended sentences.

In terms of the need to protect the public, the offense conduct was many years ago and Mr. Wellesley has personally turned a corner.  Armed with a job waiting for him upon his release, he appears ready to lead a law-abiding life.

Judge Weinstein has correctly observed, "[p]ersons who commit white-collar crimes [] are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010). Thus, "[a] serious sentence is required to discourage such crimes." Id. This admonition of course does not necessarily equate to a Guidelines sentence; the defendant in *Stein* received a nine-year term (108 months) with a Guidelines range of 188 -235 months.  *Id.*

Five-and-a-half years is undeniably a "serious sentence," particularly where it is served under difficult conditions and will be completed in a foreign country far from a defendant's loved ones.  The defense respectfully submits no more is necessary to achieve the purposes of sentencing.

<div style="margin-left: 50%;">

Respectfully submitted,
/ s/
Michael D. Weil
Michael_weil@fd.org
(718) 407-7413

</div>

cc:    AUSA Benjamin Weintraub
       Probation Officer Erica Vest